## MANGHAM *vs.* COX & WARING.

[ACTION AGAINST OWNERS OF STEAMBOAT TO RECOVER VALUE OF SLAVE TRANSPORTED
WITHOUT OWNER'S PERMISSION AND LOST.]

1. *Construction of penal statutes.*—The settled rules of construction justify the courts in confining the operation of penal statutes to cases which are clearly within their letter, and which are not proved to be clearly without their spirit.

2. *Construction of statute (Code, §§ 1010–11) forbidding transportation of slave by railroad or steamboat without owner's written authority.*—It is no defense to an action against the owners of a steamboat, to recover the value of a slave transported on their boat without the written authority of his owner, that the slave was a runaway when he came on board the boat at Mobile; that he was not discovered until after the boat had gone seventy-five miles up the river on her trip to Montgomery; that he was then arrested, and chained until the arrival of the boat at Montgomery, when he was carried to the county jail, while the boat proceeded to Wetumpka; that he was at that time sick with pneumonia, and so continued until his death, which occurred a few days afterwards; and that the defendants furnished him with proper medical attendance during his sickness.

APPEAL from the Circuit Court of Mobile.

Tried before the Hon. C. W. RAPIER.

THIS action was brought by Willis W. Mangham against Jesse Cox and Moses Waring; and the complaint, as amended, was as follows: "The plaintiff claims one thousand dollars damages from the defendants, who are the owners of the steamboat Fashion, for permitting plaintiff's slave Spencer to be conveyed on said boat from Mobile to Montgomery, in the month of February, 1853, said negro then and there having had no pass, or permit, from said plaintiff; and by reason of said negro being so conveyed to Montgomery as aforesaid, against the consent of plaintiff, he was and is wholly lost to said plaintiff. And plaintiff now claims of said defendants, part owners of said steamboat as aforesaid, the value of said slave, to-wit, one thousand dollars, pursuant to section 1010 of the Code of Alabama." The defendants separately pleaded not guilty.

"On the trial of the cause," as the bill of exceptions states, "the plaintiff offered evidence tending to prove that he was

the owner of a certain negro slave, named Spencer ; that said slave ran away from him, in the city of Mobile, in February, 1853, and was transported on the steamboat Fashion, during said month, from Mobile to Montgomery, Alabama, without the verbal or written permission of plaintiff, or of any other person ; that said negro was the property of plaintiff, and said defendants were at that time the owners of said boat ; that said negro was wholly lost to plaintiff, and that he was worth from $800 to $1000. The plaintiff here rested his case.

"The defendants then offered evidence, tending to show that said negro was not discovered on said boat, until after she had ascended the river some seventy-five miles above Mobile ; that he was put in irons, by the direction of the captain, as soon as he was discovered, and chained to a post some eight or ten feet aft the boiler ; that said slave had no blanket, nor covering of any kind, except the clothes he had on, but there were some blankets belonging to the boat hands near where he was chained, and he was told that he could use them ; that when said boat reached Montgomery, said slave was sent to the county jail, and there confined, by order of the captain of said boat, while the boat proceeded on her upward trip to Wetumpka ; that said negro was sick when he was committed to jail at Montgomery, and continued sick until his death at said jail ; that physicians were called to see him, and he was attended by them until his death ; and that the defendants paid the physicians' bills. There was evidence tending to show that one Vickers, who is a relative of plaintiff, went to the office of Waring & Co., in consequence of having been informed that said negro had probably been carried off on said boat ; that a dispatch was written by Waring, and sent to the agent of said boat at Cahaba and at Montgomery, a copy of which is hereto attached," and which was in these words : " To Capt. J. J. Cox.—See if you have boy Spencer on board, belonging to Mr. Mangham. The boy came down with you the last trip. If on board, bring him back." " There was evidence, also, tending to show that said Cox, who was the captain of said boat, and in command of her at the time of said trip, is, as a commander of a steamboat, a careful and prudent man, and a first-class captain. The defendants here closed their case."

The plaintiff, in rebuttal, read the deposition of one John T. Sheppard, who testified, in substance, that he has standing on the wharf in Montgomery when the steamboat landed there, and saw the slave, whom he recognized as plaintiff's boy Spencer, brought on shore in chains; that he examined the slave, and thought him very sick with pneumonia; that the men who had charge of the slave, and who were unknown to witness, said they were going to carry the boy to jail; that witness told them, the boy would certainly die if they carried him to jail in that condition,—that they had better let him take the boy, as he knew his master, to the house where he kept his own negroes, and have him attended to,—and that he was going to Mobile in a few days, and would take the boy down to his master's brother; that they replied, the boy was a runaway, and they were responsible for him, and intended to carry him to jail, where he would be safely kept; and that they then carried him off towards the jail.

"On this evidence, the court charged the jury,—

"1. That the owners of the boat were liable to the owner of the slave for his value, if the slave was transported on their boat without the written authority of the owner, or of the person in charge of him, and was lost; provided, the slave went on board, and was transported on said boat, under the employment, or with the knowledge, of those having charge of said boat.

"2. But that if the slave was a runaway, and went on board the boat, and was transported thereon some distance, without the knowledge of the owners or officers of said boat, such transportation would not make the owners of the boat liable for the value of the slave, though he was thereby lost to the owner, unless those in charge of the boat, after the slave was discovered to be on board, continued to transport him, and neglected to employ reasonable and proper means to secure and preserve him, and to have him restored to his owner.

"3. But that if the slave was taken off on the boat without the knowledge of the owners or officers of the boat, and those in charge of the boat, after he was discovered to be on board, continued to transport him, and neglected to use reasonable and ordinary means to secure, preserve, and have him restored

to his owner, and the slave was lost in consequence of such neglect, then the owners of the boat would be liable for his value.

"4. That although said slave may have been transported on said boat, from Mobile to Montgomery, without the written authority of the owner or person in charge of him, and may have been put in the jail at Montgomery, and there died; yet the owners of the boat would not be liable for his value, unless said slave was taken off on said boat, in the first instance, under the employ of those having charge of the boat, or with their knowledge, or was lost, after being discovered on board, in consequence of the neglect of those in charge of the boat to use reasonable and ordinary care to preserve him, and to have him restored to his owner."

The plaintiff excepted to these charges, and requested several others, of which the first was as follows : " That if the jury should believe from the evidence that said slave was the property of the plaintiff in February, 1853, and was transported on board said boat, then the property of the defendants, from Mobile to Montgomery, without the written authority of his owner or the person having charge of him,—then it devolved on defendants to show that plaintiff had regained the possession of said slave ; otherwise, they are liable for his value to plaintiff." The court refused this charge, and plaintiff excepted.

The charges given, and the refusal of the charges asked, are now assigned as error.

WILLIAM BOYLES, for the appellant.—As a general rule of construction, the intention of a law is to govern ; and that intention is to be ascertained, first, from the words of the act itself. If the words are clear and unambiguous, the statute itself is the best expositor ; and the courts are bound to take it without abridgment or addition, if it be not unconstitutional, whatever may be their opinion of its wisdom or policy. If the words are not explicit, another rule of construction, equally well established, requires that the old law and the mischief, or (what is the same thing) the occasion and reason of the enactment, are to be considered in ascertaining the meaning. As to these rules of construction, see Dwarris on

Statutes, 694–5, 702–3 ; 1 Kent's Com. 461, 467 ; 2 Cranch, 202 ; 6 B. & C. 715 ; 7 B. & C. 560.

The language of the statute, under which this action was brought, is clear and explicit beyond all controversy. Before the adoption of the Code, the defendants would have been liable for the value of the slave, if he had been carried off with their knowledge, and thereby lost to the owner.— 8 Porter, 191. There was, then, no necessity for this statute, unless it was intended to fasten an additional liability on the owners of steamboats, for the transportation of slaves without the written authority of their masters. The occasion and reason of the enactment are to be found in the facts, that vessels are frequently leaving Mobile, for ports in other States and countries where African slavery does not exist ; and that slaves are frequently carried off in such vessels, and thereby lost to their owners. It could not have been intended to limit the liability of the owners of the vessel, to cases in which it could be proved that, when the vessel left the port, her officers knew that the slave was on board. It would be very difficult, if not impossible, to bring home to the officers knowledge of that fact ; and to require proof of it would contradict the evident spirit and intention of the act. It is the duty of the officers to have a competent watch on the boat, whose business it should be to see that slaves, or other persons, are not improperly concealed on board ; and the neglect of this duty gives a right of action to any one who is thereby injured. The following decisions, on similar statutes, sustain this construction : Nashville & Chattanooga Railroad Co. v. Peacock, 25 Ala. 229 ; Winston v. Foster, 5 Robinson's La. R. 113 ; 17 La. R. 546.

It is the duty of any person, who may arrest a runaway slave, to carry him before a justice of the peace ; and it is the duty of the justice, either to commit the slave to jail, or to send him to his owner, when known. If the slave in this case was arrested in Mobile county, by what authority was he taken to Montgomery ? The party arresting him, on the same principle, would have had the right to carry him to any other county in the State. If the officers of the boat were the wrong-doers in the first instance, and their negligent conduct caused the slave's sickness and death, the owners of the boat are liable for his value.

GEO. N. STEWART, *contra.*—The complaint charges the defendants, as joint owners of the steamboat, for permitting the transportation of the slave ; but there is no charge of negligence in them or their officers, nor of any want of skill or care on the part of the officers. The liability is charged under a penal statute, which cannot be violated, unless a wrong is willfully or negligently done to the right of another: a party cannot be charged with a penalty, unless he was in a condition to elect whether or not he would incur that penalty. The statute means an unlawful carrying, to the injury of the owner.

It is not shown when, where, or how the negro came on the boat. The character of his transportation was changed by his arrest ; but neither before, nor after the arrest, was the carrying a violation of the statute. The carrying, before it was discovered that the slave was on board, was against the will of the carrier. The slave was a runaway ; neither his master, nor the carrier, had any control over him. He was acting on his own volition, and eluded the care and vigilance of both his master and the carrier, who were equally injured by the concealment and fraud. It was the misfortune of the plaintiff to be the owner of vicious property. It was his legal duty to watch over his slave, and to take care that he did not injure others. If he suffered the slave to escape from his custody, and to roam at large, he cannot hold an innocent person responsible for the consequences.

The arrest was lawful. The law, in such case, vests in any one authority to seize the slave, for the use and benefit of the master, and at his expense. The party arresting then becomes the legal agent of the owner, and his bailee for a reward, with power to protect and preserve the property for the master's use. From the moment of the arrest, the master, in legal contemplation, through his lawful agent and bailee, regained the possession of the slave ; and the carrying was, from that moment, by his bailee, and for his benefit. The arrest of the slave as a runaway, and his subsequent confinement, with intent to restore him to his master, was an individual act, and not the act of an officer of the boat. Any public officer, or any other person, had the same authority to arrest the slave ; and no liability could be thereby created against the owners of the boat.

In support of these positions, the following authorities are relied on : Russell v. Irby, 13 Ala. 131 ; 22 Ala. 568, 677, 629 ; 23 Ala. 724 ; 7 Humph. R. 134, 148 ; 1 Cowen, 78 ; 19 Johns. 385 ; 8 Barr, 479 ; 7 N. H. 221, 518 ; 4 N. H. 36, 512 ; 1 Foster's (N. H.) R. 363 ; Code, §§ 1023, 1029, 1008, 1016, 1006 ; Dwarris on Statutes, 690–1, 694–5, 756–7.

RICE, C. J.—Our first duty in this case is, to determine the meaning of two sections of the Code, which are in the words following :

" § 1010. Any railroad company, in whose car or vehicle, and the master or owner of any steamboat or vessel, in which a slave is transported or carried, without the written authority of the owner or person in charge of such slave, forfeits to the owner the sum of fifty dollars ; and, if such slave is lost, is liable for his value, and all reasonable expenses attending the prosecution of the suit."

" § 1011. In any action under the preceding section, it devolves on the defendant to prove that the owner has regained possession of the slave."

Section 1010 has created a new wrong, and described the persons who shall be liable for it, and to whom, and to what extent, they shall be liable. The wrong consists in the carrying or transportation of a slave, in a car or vehicle of a railroad company, or in a steamboat or vessel, " without the *written* authority of the owner or person in charge of such slave." When such transportation or carrying is in a car or vehicle of a railroad company, the company is liable for it to the owner of the slave. When such transportation or carrying is in a steamboat or vessel, the master or owner thereof is liable to the owner of the slave. When the slave is not lost, but is restored to the possession of his owner, the extent of the liability is the forfeiture of fifty dollars. When the slave is lost, the extent of the liability is " his value and all reasonable expenses attending the prosecution of the suit." And when, in a suit brought under section 1010, proof is made by the plaintiff, of such carrying or transportation of his slave, in this State, section 1011 requires the presumption to be indulged that the slave is lost, unless it is proved that the owner has regained possession of him.

But, although such is evidently the literal and natural meaning of the words employed in these sections, yet the settled rules for the construction of such statutory provisions, justify the courts in confining their operation to cases which are clearly within their letter, and which are not proved to be clearly without their spirit.—9 Bacon's Abr., ed. of 1846, 246–251 ; Faw v. Marsteller, 2 Cranch, 10 ; 1 Bishop on Cr. Law, § 111 ; Reniger v. Fogassee, Plow. 13 ; Strange v. Croker, *ib.* 88.

Section 3130 of the Code provides, that " any person who inveigles, steals, carries, *or* entices away any slave, with intent to convert such slave to his own use, or the use of another, or to enable such slave to reach a State or country where he would enjoy his freedom, must, on conviction, be imprisoned in the penitentiary, not less than five, nor more than twenty years." That section was, in substance, but a re-enactment of a statute which had been of force for several years.—Spivey v. The State, 26 Ala. R. 90. But, until the adoption of the Code, we had no statutory provisions similar to those contained in sections 1010 and 1011 above copied. The insertion in the Code, of the new and unusual provisions contained in those sections, tends very strongly to show, not only that the legislators deemed the protection to slave property, afforded by the former laws, inadequate under the circumstances, but that they were actuated by the deliberate purpose of increasing the security of the owners of slaves, by enabling them to recover upon facts which, under the former laws, would not have entitled them to recover.

The immense value of that species of property ; the peculiar nature of slaves ; the known disposition of at least a portion of the abolitionists of the non-slaveholding States, to delude them by art and persuasion to avail themselves of all facilities for escaping from their owners; the extent of the water boundary of this State ; the number of steamboats and vessels navigating the waters and rivers within our limits, and of vehicles running upon railroads in this State ; the celerity of the movements of these boats, vessels and vehicles ; and the consequent exposedness of the owners of slaves, to the depredations of the fanatical and vicious, collectively considered, have called forth the legislation upon the meaning of which

this case must turn. The purpose and scope of that legislation is, " a stern and stringent protection" of slave propert from loss, by the bad faith or negligence of those engaged in running cars on railroads, or in the navigation of the river and waters within this State. It was not designed to make the owner or master of a steamboat liable for an act or thing which neither of them could by any diligence have prevented. But it proceeds upon the assumption, that the master of a steamboat can prevent any slave from being carried or transported on it, who has not " the written authority" of his owner or person in charge of him. It makes it his duty to prevent any such carrying or transporting of a slave.—The Steam Nav. Co. v. Hungerford, 6 Gill & Johns. 291. It makes the omission to perform that duty, a wrong. If that duty is performed, no responsibility can attach. If that duty is not performed, responsibility does attach. We will not say that there can be no valid legal excuse for the omission of that duty ; but we do say, that no such excuse is shown by the evidence in the present case.

However inconvenient or difficult it may be for the master of a steamboat to prevent any slave from being carried or transported on it, without " the written authority" of his owner or person in charge of him, yet it is not impossible for him to do it. The legislature has made it his duty to do it, and declared the consequences of his failure. The legislature has scrupulously exacted such " *written* authority." The law is plainly one of public policy, which we are bound to enforce and maintain, whatever may be our opinion of its wisdom or justice, and however severe may be its operation in particular cases.

It is, perhaps, due to the legislature to say, that giving due weight to the circumstances which called forth the law now under consideration, it cannot well be said that it is more severe on masters and owners of steamboats, than the common law was upon sheriffs in cases brought against them for negligent escapes.—Elliott v. The Duke of Norfolk, 4 T. R. 789; Adams v. Turrentine, 8 Iredell's Rep. 147. See, also, Dale v. Hall, 1 Wils. 281 ; Platt v. Hibbard, 7 Cowen's Rep. 497. and notes.

On examination, we find that the statutes of Tennessee.

Kentucky and Louisiana differ in phraseology from section 1010 of our Code. For instance, the statute of Tennessee provides, that " no stage contractor, or driver, or owner, or captain of any steamboat or other water craft, shall *receive and carry*" a slave without " a *verbal* or written authority from the owner or owners." In relation to that statute, the supreme court of that State say : " The statute does not punish for *the mere act of carrying off*, but punishes for *the receiving and carrying off.* This makes the punishment consistent with justice, for the word *receiving* necessarily implies *an act knowingly done ;* for no man can receive, without his knowledge and consent."—Duncan v. The State, 7 Humph. Rep. 148.

It must be noticed, that section 1010 of our Code gives the remedy, and prescribes the penalty, for *the mere act of carrying or transporting a slave* '· *without the written authority*" *of the owner or person in charge of him ;* and that it does not use the word "·receive," nor any other word from which an implication can fairly be drawn, that the act must be *knowingly* done, to entitle the owner of the slave to sue and recover.

Keeping in view the differences between the provisions of the laws of Tennessee, Kentucky and Louisiana, and the provisions of sections 1010 and 1011 of our Code, we think the decisions of those States support the view we have taken of those sections.—See Duncan v. The State, *supra ;* Buel v. The Steamer New York, 17 La. Rep. 541 ; Feltus v. Anders, 5 Robinson's Rep. 7 ; Winston v. Foster, *ib.* 113 ; Rountree v. Brilliant Steamboat Company, 8 La. Annual Rep. 289 ; Graham v. Strader, 5 B. Monroe, 177 ; McFarland v. McKnight, 6 B. Monroe, 505.

Upon the evidence in the case, and the law as herein above announced, it is clear that the court below did not, in its affirmative charges, put the case properly before the jury, and that it erred in refusing the first charge asked by the appellant. As to the refusals of the second and third charges asked by him, we think it unnecessary to say any thing.

The judgment of the court below is reversed, and the cause remanded.